**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN HASSETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 23 C 14592** |
| | ) | |
| **UNITED AIRLINES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

 John Hassett has sued United Airlines, Inc., his employer, under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(1), claiming that United discriminated

against him by not reasonably accommodating his religious objection to receiving a

COVID-19 vaccination.  United has moved for summary judgment.  For the reasons

below, the Court grants the motion.

**Background**

United is one of the world's largest airlines.  Hassett has been a pilot for United

since its acquisition of Continental Airlines in 2010 (and was a pilot for Continental

starting in 1989).

On August 6, 2021, United announced that it was implementing a COVID

vaccination requirement for its United States-based employees, which included Hassett.

United's vaccination policy required U.S. employees to receive a COVID vaccination by

September 27, 2021 or request a medical or religious exemption by August 31, 2021.

Hassett requested an exemption from the vaccination requirement, citing a religious

objection to being vaccinated. United asked for additional information about Hassett's religious beliefs, which he provided, and it ultimately granted Hassett a religious exemption. Hassett later filed a request for a medical exemption in addition to his religious exemption, stating that he discovered he had "SARS-CoV-2 antibodies" and had "found multiple scientific studies indicating that people who have had and recovered from CoVid are very safe." Def.'s Stat. of Facts (DSOF), Ex. 18 at 3. United did not grant Hassett's medical exemption request.

United accommodated exempt employees differently depending on the employee's type of job and the nature of the exemption. United did not permit its pilots to fly its planes without being vaccinated. Instead, United provided exempt pilots with paid leave from October 2021 to November 11, 2021 and unpaid leave for up to six years. For pilots with a religious exemption, like Hassett, the unpaid leave was categorized as personal leave. Based on the collective bargaining agreement between United and the pilots' union, pilots could not use pass travel privileges while on personal leave. United additionally granted its exempt pilots "preferred consideration for open non-customer facing roles, including but not limited to: Ramp Service, Storekeeper, Technician, Reservation Sales and Services Representative, and some Management and Administrative positions." DSOF, Ex. 23 at 2. United also waived its ethical prohibition against outside employment, permitting exempt pilots to fly for other airlines while remaining with United.

With the exception of applying for one non-United job, Hassett did not pursue any of these alternative jobs. On March 10, 2022, United announced that it believed the pandemic was "beginning to meaningfully recede" and that it planned to soon allow

exempt employees to return to work.  DSOF, Ex. 17 at 3.  Ultimately, United permitted Hassett to return to work on March 28, 2022.  Hassett was on unpaid leave for four and a half months.

## Discussion

Summary judgment is appropriate if there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (quoting Fed. R. Civ. P. 56(c)).  In other words, a court may grant summary judgment if a jury could not reasonably find for the nonmovant based on the evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–252 (1986).

The party seeking summary judgment bears the initial burden of showing that there is no genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the movant has met this burden, the "party that bears the ultimate burden at trial must show that there is evidence creating a genuine issue of material fact."  *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000) (citing *Celotex*, 477 U.S. at 323–25).

## A.    Failure to accommodate legal standard

"Title VII of the Civil Rights Act of 1964 requires employers to accommodate the religious practice of their employees unless doing so would impose an 'undue hardship on the conduct of the employer's business.'"  *Groff v. DeJoy*, 600 U.S. 447, 453–54 (2023) (quoting 42 U.S.C. § 2000e(j)).  An employee bringing a failure-to-accommodate claim must first show that:  "(1) the observance or practice conflicting with an employment requirement is religious in nature; (2) the employee called the religious observance or practice to [the] employer's attention; and (3) the religious observance or

3

practice was the basis for [the employee's] discharge or other discriminatory treatment." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013) (internal quotation marks omitted). The burden then shifts to the employer to show that it could not reasonably accommodate the employee's religious belief or practice without undue hardship. *Id.*

A reasonable accommodation is one that "eliminates the conflict between employment requirements and religious practices." *Jackson v. Methodist Health Servs. Corp.*, 121 F.4th 1122, 1126 (7th Cir. 2024). If an employer shows that it offered a reasonable accommodation, it has met its Title VII obligations and "need not further show that each of the employee's alternative accommodations would result in undue hardship." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68–69 (1986). But if an employer has not offered the employee a reasonable accommodation, it must show that it could not do so without undue hardship. *Adeyeye*, 721 F.3d at 455; *see Groff*, 600 U.S. at 473 ("Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations.").

An accommodation imposes an undue hardship on an employer when the "hardship would be substantial in the context of [the] employer's business." *Groff*, 600 U.S. at 471. This inquiry is fact-specific, and a court must consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [the] employer." *Id.* at 470–71 (internal quotation marks omitted). The Seventh Circuit has clarified that an employer must "demonstrate an objective undue hardship on its business, not one just

4

subjectively perceived." *Kluge v. Brownsburg Cmty. Sch. Corp.*, 150 F.4th 792, 808 (7th Cir. 2025).

In this case, United has accepted for purposes of summary judgment that Hassett has made his prima facie showing of failure to accommodate. United argues that summary judgment is nonetheless appropriate for two reasons. First, United contends that it reasonably accommodated Hassett's religious beliefs. Second, it asserts that alternative methods of accommodation would cause undue hardship. The Court need not consider United's first argument because it agrees with the second: even if United did not reasonably accommodate Hassett's religious beliefs, it could not do so without undue hardship.

## B.    Undue hardship

United argues that its vaccination requirement was the best way to ensure the safety of its passengers and employees. It contends that it could not have reasonably accommodated Hassett without undue burden because alternative measures would have been less safe and less feasible than requiring vaccination. Hassett contends there are three ways that United could have allowed him to fly unvaccinated without undue hardship:  letting him rely on his claimed natural immunity, requiring masking, and/or implementing COVID testing. The Court concludes that these proposals would have imposed a substantial burden on United and illustrate why United could not reasonably accommodate Hassett without undue hardship.

### 1.    Natural immunity

Hassett suggests that United could have let him fly unvaccinated without undue hardship because he had natural immunity from a previous COVID infection. United

5

responds that it "considered and reasonably rejected natural immunity as a viable alternative to vaccination," based on scientific evidence and medical expert advice available at the time.  Def.'s Mem. in Supp. of Mot. for Summ. J. at 11.  Additionally, United notes that it "received complaints from a large number of vaccinated pilots who said they would refuse to fly in a cockpit with unvaccinated individuals, which would have caused further operational problems."  DSOF ¶ 40.

As other courts have held, "[i]n determining whether an accommodation would pose an undue hardship, an employer is permitted to draw conclusions based on evidence and information that was available at the time."  *See, e.g.*, *Henry v. S. Ohio Med. Center*, 155 F.4th 620, 632 (6th Cir. 2025).  United has shown that the evidence and information available at the time it established its accommodation policies indicated that claimed natural immunity was objectively less safe than vaccination.  William Kirk Limacher, United's vice president of human resources during the relevant times, testified in a deposition that United consulted with a "myriad of high profile medical experts."  Pl.'s Stat. of Facts (PSOF), Ex. I (Limacher Dep.) at 26:8–26:21.  According to Limacher, those experts included the Centers for Disease Control and Prevention (CDC), the Federal Aviation Administration (FAA), Cleveland Clinic, John Hopkins, Premise Health, CVS, Walgreens, and the Department of Health and Human Services (HHS).  Limacher further testified that based on those discussions, United determined that natural immunity as an alternative to vaccination presented two problems:  "One[,] the direction being provided at the time was that natural immunity was not as strong as the immunity gained through vaccination; and, two, that there was not a reliable and scaleable method for testing natural immunity."  *Id.* at 46:9–46:19.

6

The report by Dr. Del Rio, one of United's experts, corroborates and fleshes out those concerns. Del Rio states in his report that "natural immunity's protection falls far short of the protection provided by vaccination." DSOF, Ex. 9 (Del Rio Report) ¶ 63 (citing an August 13, 2021 CDC study). Besides the degree of protection, Del Rio states that the extent and duration of protection from previous infection varies depending on multiple factors. He further points out that a CDC study published in September 2021 found that thirty-six percent of previously infected participants did not form any antibodies against the virus. Del Rio notes that, in contrast, 100 percent of "non-immunocompromised people who receive even one dose of an mRNA vaccine" develop antibodies. *Id.* ¶ 67. In short, natural immunity is less predictable, and therefore less reliable, than vaccination.

As Limacher further indicated, the difficulty of detecting natural immunity exacerbated those reliability concerns. Del Rio asserts that "in 2021 there were no commercially available tests that were fully reliable to quantify antibodies." *Id.* ¶ 68. And even if United could have confirmed Hassett's antibody levels, it still could not be confident that he was immune from infection. Hassett's own lab test result document confirming his previous infection warns that "studies are still needed to determine the [antibody] threshold that confers protective immunity as well as how long the adaptive immune response may last." DSOF, Ex. 26 at 2. The document later reiterates that warning in a more direct way: "A positive result does not mean you are immune to SARS-CoV-2 (Coronavirus) as additional studies are required to understand the immune status in relation to COVID-19." *Id.* at 3.

This evidence reflects that relying on a claim of natural immunity would have

increased the risk of COVID infection. And more COVID infections would have been costly. COVID resulted in a significant number of hospitalizations and deaths, including among United's employees. Courts across the nation have consistently found that the "significant health and safety costs" from allowing unvaccinated employees to continue working during the pandemic would have been an undue hardship for employers. *See, e.g.*, *Petersen v. Snohomish Reg'l Fire & Rescue*, 150 F.4th 1211, 1220 (9th Cir. 2025); *Hall v. Sheppard Pratt Health Sys., Inc.*, 155 F.4th 747, 753–55 (4th Cir. 2025); *Henry*, 155 F.4th at 632–33; *Wise v. Child.'s Hosp. Med. Center of Akron*, No. 24-3674, 2025 WL 1392209, at *3–*5 (6th Cir. May 14, 2025). The parties also agree that COVID hit United particularly hard. "United's business was hurt financially by the massive decline in air travel during the pandemic . . . ." PSOF ¶ 10. Additionally, United experienced "a shortage of pilots, flight attendants, customer service agents, and technicians as a result of illness caused by COVID-19." *Id.* Permitting Hassett to continue flying unvaccinated would have entailed taking on the risk that he would become infected—a greater risk than for vaccinated employees—and, at least as importantly, that he would endanger the health of others and exacerbate United's health and business struggles during the pandemic.

Moreover, that risk was multiplied by hundreds of other United pilots with the same exemption. As other courts have found, in some circumstances, the analysis for undue hardship "naturally include[s] the 'aggregate effects when multiple employees are granted the same accommodation.'" *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1152–53 (D. Or. 2024) (citing cases); *see, e.g.*, *Petersen*, 150 F.4th at 1220; *Wise*, 2025 WL 1392209, at *5. This case presents this very point: as Hassett

acknowledges, United knew it would have to accommodate 200–300 other pilots who were also exempt from the vaccination requirement. To be sure, it is likely that some of those pilots had not been previously infected and therefore would not have qualified for a "natural immunity" exception. But among the hundreds of other pilots with vaccination exemptions, there is virtually no chance that Hassett was the only one who was previously infected. Each additional pilot who was allowed to fly unvaccinated would have increased the risk to United at an exponential rate given exposure to others. *See Wise*, 2025 WL 1392209, at *5. And this all assumes that United would have been able to reliably detect who had a "natural immunity" comparable to vaccine immunity. Besides the obvious logistical costs entailed in conducting antibody testing for every pilot seeking an accommodation,[1] United has produced unrebutted evidence that natural immunity was highly variable from person to person and could not be reliably measured at the time. These safety and logistical burdens would have been substantial in light of United's business as a whole and therefore amounted to an undue hardship.

Hassett responds in three ways. First, he objects that Del Rio's expert report is inadmissible hearsay. But at the summary judgment stage, "evidence need not be in admissible *form*." *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994). Instead, a court may consider evidence that is "admissible in *content* [if] a change in form . . . , for example a substitution of oral testimony for a summary of that testimony in

---

[1] Hassett points out that "United already relied heavily on testing, including for pilots." PSOF ¶ 44. But United's testing protocols were for self-reported COVID-detection tests (the kind you can buy from your local pharmacy), which only measure current infection. *See* PSOF, Ex. F. Past infections are detected by antibody tests, which are administered by a medical professional. *See generally COVID-19 Test Basics*, U.S. Food & Drug Administration (Sep. 7, 2023), https://www.fda.gov/consumers/consumer-updates/covid-19-test-basics.

an [inadmissible form], would make the evidence admissible at trial." *Id.* at 1268. In this regard, the Court further notes that the commentary to Federal Rule of Civil Procedure 26 indicates that an expert report under Rule 26(a)(2) "is intended to set forth the substance of the [expert's] direct examination [and] should be written in a manner that reflects the testimony to be given by the witness . . . ." Fed. R. Civ. P. 26, advisory committee's note to 1993 amendment. Del Rio's report meets these descriptions. Hassett does not contest that Del Rio's report is admissible in content. And all of that aside, United has submitted an affidavit from Del Rio attesting that he would testify at trial consistently with his report.

Second, Hassett challenges the relevance of two of Del Rio's conclusions: (a) observational studies on natural immunity were less reliable than the phase three clinical trials for vaccine approval, and (b) natural immunity was highly variable from person to person. These points of uncertainty, Hassett contends, are "immaterial to the issue of whether [he] could be reasonably (not perfectly) accommodated." PSOF ¶¶ 42–43. Relatedly, he states that "[t]he vaccine was also not fully reliable." *Id.* ¶ 44. The Court disagrees. First, safety and risk judgments are necessarily probabilistic and are based on the information that is available. For United, the risk of relying on natural immunity depended on the reliability of any study that suggested natural immunity was safe, and thus a determination that such a study was less than reliable is significant in the safety calculus. Similarly, the variability of natural immunity and, importantly, difficulty of detecting it translated directly to risk that Hassett (and other pilots claiming natural immunity) might not actually have a comparable degree of immunity to that provided by the vaccine. The other problem is that Hassett underestimates the burden

to United from an increased risk of COVID infection. As explained above, even modest increases in the risk of infection would likely impose substantial burdens on United.

Third, Hassett relies on a CDC study published on January 28, 2022 finding that by October 2021, when the Delta variant had taken over as the dominant COVID variant, unvaccinated individuals with a previous infection were less likely to be infected than vaccinated individuals without a previous infection. That study does not create a genuine issue of material fact on the question of undue hardship. Reliance on natural immunity would cause an undue hardship to United because it would entail betting the safety of its employees and customers based on an unknown as opposed to vaccination, a relatively certain preventative measure. The January 2022 CDC study— which, the Court notes, came over two months after Hassett had already been on unpaid leave and not that long before he was allowed to return to work—did not change that calculus. It was a single observational study that did not purport to change the medical consensus—based on thorough clinical testing—that natural immunity was not an adequate alternative to vaccination. To the contrary, the study itself concluded that "vaccination remains the safest strategy to prevent SARS-CoV-2 infections and associated complications." Tomás M. León et al., *COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis – California and New York, May – November 2021*, Center for Disease Control & Prevention, https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm (Jan. 28, 2022).

The evidence reflects that in the context of a "rapidly evolving, highly uncertain novel pandemic," relying on natural immunity as a preventative measure was objectively less safe than relying on vaccination. *See Wise*, 2025 WL 1392209, at *3 (declining to

second-guess the defendant's health and safety judgments with the benefit of hindsight). The risk of infection and its downstream effects would have imposed an undue hardship on United. No reasonable jury could find otherwise.

## 2. Masking

Hassett's second proposed alternative is that United could have let him fly unvaccinated on the condition that he wear a mask while doing so. United responds that masking is less effective than vaccination at preventing COVID. Additionally, United argues that requiring pilots to wear masks would create other safety risks by interfering with "critical communications" and pilots' "ability to quickly don an oxygen mask." Def.'s Mem. in Supp. of Mot. for Summ. J. at 15.

United has met its burden to show that a masking accommodation would have caused it undue hardship. As the above analysis suggests, and as Hassett acknowledges, the "bulk of the medical community" agreed that "vaccines were the best way to prevent hospitalization and death from COVID." PSOF ¶ 17; *see* DSOF, Ex. 2 (Hassett Dep.) at 110:1–110:8. Del Rio, in his expert report, states that the efficacy of a mask requirement at work is limited by difficulty in enforcement, the need to remove masks occasionally, the type of mask used, and the inability to prevent infection outside of the workplace. Hassett offers no evidence to rebut that medical conclusion. As with Hassett's natural immunity proposal, United did not have to settle for masking as a less effective alternative to vaccination.

Besides the discrepancy in effectiveness, masking presented other problems. For one, masking would be difficult to monitor for compliance. *See* Del Rio Report ¶ 53; *see also* Limacher Dep. at 74:7–74:15. Furthermore, Jerome C. Ostronic, another one

of United's experts, opined that masking would make it more difficult for pilots to communicate and would increase the amount of time a pilot would take to don an oxygen mask in an emergency situation. Hassett's co-pilot, Captain Jonathan Whitfield, similarly testified in a deposition that pilots were frustrated with masks on the flight deck because they "hindered communications" and the ability to "don and use [an] oxygen mask in five seconds." DSOF, Ex. 27 at 58:10–59:24. Hassett himself agreed with those concerns:

> Q: And when you're in the cockpit, would you agree that you really can't wear a mask?
> A: Yes.
> Q: As a pilot I mean?
> A: Yes.
> Q: You would agree? Why do you think that?
> A: Because you can't function and communicate properly with a mask on in that environment.
> Q: Because you have to clearly communicate over the radio?
> A: And with each other, yes.
> Q: Okay.
> A: And it's a noisy environment.
> Q: It's a noisy environment really?
> A: Yes.
> Q: Okay. And so this is when you're in the cockpit actually flying the plane?
> A: Correct.
> Q: Correct. You have to communicate over the radio; you have to be able to hear properly because it's a noisy environment. Correct?
> A: Correct.
> Q: And so masks could interfere with that communication?
> A: Yes.
> Q: Okay. And I only found this out by virtue of this case, but is it correct that masks could also potentially interfere with your ability to put on your oxygen mask quickly?
> A: Yeah. You didn't ask me that part, so I didn't answer. I'm sorry.
> Q: Yeah. I was shocked when I learned it, but is it true that pilots are supposed to be able to put on their oxygen mask with one hand and in 5 seconds?
> A: Yes.
> Q: Wow. So, again, masks are going to get in the way of that?
> A: Yes.

Hassett Dep. at 176:12–178:1.

Hassett's only contrary evidence is his own affidavit—signed after United filed its motion for summary judgment—in which he states that he learned he can wear a mask without impairing effective communication or his ability to don an oxygen mask (with a demonstrative video attached). PSOF, Ex. A ¶¶ 9, 12. United argues that this declaration is excluded by the sham affidavit rule, which prohibits a party from staving off summary judgment with an "affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020).

The Court need not resort to the sham affidavit rule because Hassett's declaration does not create a genuine dispute of material fact in any event. Hassett's declaration is based on his recent attempts at wearing a mask in the cockpit. But those experiences were not in emergency situations, which is when concerns about the dangers of requiring pilots to wear masks are at their greatest. As United contends, Hassett's "single, controlled demonstration[s]" do not "replicate the real-world urgency, stress, and variability of an in-flight emergency." Def.'s Reply at 12.

Moreover, Hassett only tested with a cloth medical mask, which Del Rio states is only 57–58% effective at protecting others and 37–50% effective at protecting the user. Del Rio Report ¶ 54. In contrast, Del Rio cites two studies finding that vaccines were 73% and 93.7% effective, respectively. *Id.* ¶¶ 23–24. At the very lowest, one study in Qatar found that vaccine effectiveness against the Delta variant was between 51.9% and 73.1%. *Id.* ¶ 25. Even these figures are definitively better than those for medical masks. Hassett has not provided evidence to contest these figures.

Finally, Hassett's declaration—to the extent that it is not contradicted by his prior

deposition testimony—establishes only that he could wear a mask.  But as discussed earlier, United would also have to permit hundreds of other pilots to wear masks. Hassett's declaration does not rebut the risk that a mask requirement across the board might invite danger for other pilots.  In other words, Hassett's declaration does not create a genuine factual dispute regarding the larger question at hand—whether masking as an alternative to vaccination would impose an undue hardship on United.

In sum, a mask requirement, as compared to vaccination, was significantly less effective at preventing COVID, more difficult to monitor and enforce, and presented other safety risks for pilots.  These problems would have imposed an undue hardship on United.  No reasonable jury could find otherwise.

### 3.    Testing

Finally, Hassett contends that United could have set up a testing program for its exempt pilots to continue flying unvaccinated.  United responds with safety and logistical concerns.  First, it contends that testing is not an adequate alternative to vaccination in preventing COVID.  And in any event, according to United, testing would not be feasible.  Because pilot schedules may change up until the last minute, United would have to provide testing services at every departure location every time pilots checked in for a flight.

 United has shown that a testing program would have caused it undue hardship. Del Rio concludes in his report that "weekly testing is not sufficient to substitute for vaccinations, even when done in combination with a masking."  *Id.* ¶ 56.  One reason is that testing "identifies those who are already infected[] but does little to prevent the spread of COVID."  *Id.* ¶ 57.  Of course, once Hassett tested positive for COVID, United

could take appropriate measures to prevent further infection by quarantining him. But Hassett would be tested only before flights. If Hassett caught COVID (more likely to happen because he was unvaccinated), he could unknowingly spread it until the next flight. And again, for United that risk was multiplied by the 200–300 pilots in similar circumstances.

Testing also would have imposed an undue hardship on United from a logistical perspective. United assigns trips to pilots via a seniority-based bidding system. Pilots also frequently trade assignments. As a result, United does not know for certain until the last minute which pilots, including unvaccinated pilots, are on which flights. Thus a testing requirement would work only if United provided testing at every possible flight that could include an unvaccinated pilot. According to United, that would be highly impractical because it would require United "to create an entirely new system of manual scheduling" to build in time for testing for those flights. DSOF ¶ 72.

Hassett does not offer evidence to the contrary. Instead, he argues that summary judgment is inappropriate because United has not produced "hard data regarding costs." Pl.'s Resp. at 13. But that is not a requirement for showing undue hardship, and there is no genuine dispute that implementing a testing program for every flight across one of the world's largest airlines would have been an undue hardship. To get around that problem, Hassett suggests that United could have limited accommodated pilots to specific flight choices to limit the scope of the testing regime. But United would still have to manually adjust those flight schedules to add buffer time for all 200–300 exempt pilots without violating federal aviation requirements, which mandate rest periods that COVID testing would count against. Moreover, that option

16

would require United to disrupt its seniority-based bidding system by carving out a set of flights on which only exempt pilots could fly.  Supreme Court precedent is clear that Title VII does not require employers to do so.  *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81 (1977) ("[S]eniority systems are afforded special treatment under Title VII itself."); *Groff*, 600 U.S. at 459–65 (observing that *Hardison* "was very clear that [transgressing seniority] rights [was] off-limits" under Title VII).

Based on the record, none of Hassett's proposed alternatives were viable for United.  United has established that they all would have been significantly less effective at preventing COVID and less feasible than vaccination, separately and combined, and those problems illustrate why any other accommodation would have imposed an undue hardship.  At the end of the day, Hassett would only accept an accommodation that would allow him to continue flying for United unvaccinated.  Given the superiority of vaccination as a preventative measure against COVID, both in terms of efficacy and ease of implementation, United had no alternative that would not impose an undue hardship.  Hassett has not offered sufficient evidence to permit a reasonable jury to conclude otherwise.

## Conclusion

 For the above reasons, the Court grants United's motion for summary judgment [dkt. 98].  The Clerk is directed to enter judgment stating:  Judgment is entered in favor of defendant United Airlines, Inc. and against plaintiff John Hassett.

Date:  November 24, 2025

_____
MATTHEW F. KENNELLY
United States District Judge